UNITED STATES DISTRICT COURT
FOR THE
MIDDLE DISTRICT OF PENNSYLVANIA

EDWARD BOYD,                          :
                                      :
          Plaintiff                   :    No. 4:11-CV-00600
                                      :
     vs.                              :    (Complaint Filed 3/30/11)
                                      :
MICHAEL ASTRUE,                       :
COMMISSIONER OF SOCIAL                :    (Judge Munley)
SOCIAL SECURITY,                      :
                                      :
          Defendant                   :

**MEMORANDUM**

**Background**

        The above-captioned action is one seeking review of a
decision of the Commissioner of Social Security ("Commissioner")
denying Plaintiff Edward Boyd's claim for social security
disability insurance benefits.

        Boyd protectively filed his application for disability
insurance benefits on March 26, 2007. Tr. 22, 68, 119, 123 and
225-231.[1]  The application was initially denied by the Bureau of
Disability Determination on June 8, 2007.[2] Tr. 136-140.  On July
23, 2007, Boyd requested a hearing before an administrative law
judge. Tr. 141.  After about 10 months had passed, a hearing was

---

1. References to "Tr.__" are to pages of the administrative
record filed by the Defendant as part of his Answer on June 2,
2011.

2. The Bureau of Disability Determination is an agency of the
Commonwealth of Pennsylvania which initially evaluates
applications for disability insurance benefits on behalf of the
Social Security Administration.  Tr. 137.

held before an administrative law judge on May 7, 2008. Tr. 66-
116.  On May 28, 2008, the administrative law judge issued a
decision denying Boyd's application. Tr. 123-132.  On July 23,
2008, Boyd filed a request for review with the Appeals Council.
Tr. Tr. 167-173.  On January 12, 2009, the Appeals Council
remanded the case to the administrative law judge for further
proceedings. Tr. 134-135.

        The administrative law judge included in Wilkinson's
residual functional capacity the following limitation: "[H]e can
only occasionally engage in tasks requiring near visual acuity
(clarity at 20" or less)." Tr. 134.  The Appeals Council stated
that "[t]he hypothetical question proposed to the Vocational
Expert by the Administrative Law Judge did not included the
occasional limitation to engage in tasks requiring near visual
acuity . . . The jobs cited by the Vocational Expert which include
call out operator . . . all require frequent visual acuity[.]" Tr.
135. The case was remanded by the Appeals Council to clarify the
impact of Wilkinson's visual limitation assessed by the
administrative law judge on Wilkinson's occupational base. Id.

        A second administrative hearing was held on May 28,
2009. Tr. 20-65.  At that second administrative hearing H.
Christopher Alexander, M.D., testified that Wilkinson was
farsighted but had no work-related visual limitations. Tr. 25 and
27.  On June 24, 2009, the administrative law judge issued a

2

decision denying Boyd's application. Tr. 12-19.  On June 29, 2009, Wilkinson filed a request for review with the Appeals Council and on February 10, 2001, the Appeals Council concluded that there was no basis upon which to grant Wilkinson's request for review. Tr. 1-5.  Thus, the administrative law judge's decision stood as the final decision of the Commissioner.

Boyd then filed a complaint in this court on March 30, 2011.  Supporting and opposing briefs were submitted and the appeal[3] became ripe for disposition on August 23, 2011, when Boyd filed a reply brief.

Disability insurance benefits are paid to an individual if that individual is disabled and "insured," that is, the individual has worked long enough and paid social security taxes. The last date that a claimant meets the requirements of being insured is commonly referred to as the "date last insured."  It is undisputed that Boyd meets the insured status requirements of the Social Security Act through June 30, 2012. Tr. 12, 14 and 123.

Boyd was born in the United States on July 25, 1963. Tr. 225, 273 and 282.  Boyd graduated from high school in June, 1981, and can read, write, speak and understand the English language and perform basic mathematical functions. Tr. 75, 77, 291

---

3. Under the Local Rules of Court "[a] civil action brought to review a decision of the Social Security Administration denying a claim for social security disability benefits" is "adjudicated as an appeal."  M.D.Pa. Local Rule 83.40.1.

and 297.  During his elementary and secondary schooling, he
attended regular education classes. Tr. 297.  At some point after
graduating from high school, Boyd obtained a commercial driver's
license. Tr. 298.

Boyd has a lengthy history of work and earnings and
held several jobs which can be considered past relevant
employment.[4]  Boyd engaged in semiskilled to skilled, light to
medium work[5] as an owner/operator/manager of a retail clothing

---

4. Past relevant employment in the present case means work
performed by Boyd during the 15 years prior to the date his claim
for disability benefits was adjudicated by the Commissioner.  20
C.F.R. §§ 404.1560 and 404.1565.

5. The terms sedentary, light, medium and heavy work are defined
in the regulations of the Social Security Administration as
follows:

    (a) *Sedentary work*. Sedentary work involves lifting no
    more than 10 pounds at a time and occasionally lifting
    or carrying articles like docket files, ledgers, and
    small tools.  Although a sedentary job is defined as
    one which involves sitting, a certain amount of walking
    and standing is often necessary in carrying out job
    duties.  Jobs are sedentary if walking and standing are
    required occasionally and other sedentary criteria are
    met.

    (b) *Light work*.  Light work involves lifting no more
    than 20 pounds at a time with frequent lifting or
    carrying of objects weighing up to 10 pounds.  Even
    though the weight lifted may be very little, a job is
    in this category when it requires a good deal of
    walking or standing, or when it involves sitting most
    of the time with some pushing and pulling of arm or leg
    controls.  To be considered capable of performing a
    full or wide range of light work, you must have the
    ability to do substantially all of these activities.
    If someone can do light work, we determine that he or
    she can also do sedentary work, unless there are

4

store and as a truck driver. Tr. 293, 318 and 343.

Records of the Social Security Administration reveal that Boyd had earnings in the years 1979 through 2007. Tr. 283. In 2007 his earnings were $2819.28. Id.  From 1993 through 2006, Boyd's earning never fell below $15,480.00. Id.  Boyd's total earnings from 1979 through 2007 were $423,315.75. Id.

Boyd claims that he became disabled on February 28, 2007,[6] because of a stroke (cerebrovascular accident), diabetes, high blood pressure, and a transient ischemic attack (TIA).[7] Tr. 292.  The

---

additional limiting factors such as loss of fine dexterity or inability to sit for long periods of time.

(c) *Medium work*.  Medium work involves lifting no more than 50 pounds at a time with frequent lifting or carrying of objects weighing up to 25 pounds.  If someone can do medium work, we determine that he or she can do sedentary and light work.

(d) *Heavy work*.  Heavy work involves lifting no more than 100 pounds at a time with frequent lifting or carrying of objects weighing up to 50 pounds. If someone can do heavy work, we determine that he or she can also do medium, light, and sedentary work.

20 C.F.R. § 404.1567.

6. Boyd  was 43 years of age on the alleged disability onset date and only 45 years of age at the time of the second administrative hearing and the ALJ's second decision. Boyd is considered a "younger individual" whose age would not seriously impact his ability to adjust to other work.  20 C.F.R. §§ 404.1563(c) and 416.963(c).

7. "A transient ischemic attack (TIA) is when blood flow to a part of the brain stops for a brief period of time. A person will have stroke-like symptoms for up to 1-2 hours . . . A TIA is different than a stroke. After a TIA, the blockage breaks up quickly and

stroke occurred on March 13, 2004,[8] and after a 10-day hospitalization, a rehabilitation period of a little over a month and some occupational therapy, Boyd returned to work on a limited basis beginning in the Fall of 2004 as an owner/operator of a clothing store. Tr. 83-84, 367 and 495-500.  In fact by June 29, 2004, Boyd had recovered sufficiently to engage in "a horse back riding trip[.]" Tr. 567. With respect to the occupational therapy, Boyd discontinued it because of insurance reasons, and he was not interested in pursuing further therapy at no cost through the state Office of Vocational Rehabilitation. Tr. 438 and 474-475.  Boyd has not worked since February 28, 2007, when he lost his store because he was unable to make payments. Tr. 73-74 and 292.

For the reasons set forth below we will affirm the decision of the Commissioner denying Boyd's application for disability insurance benefits.

## STANDARD OF REVIEW

When considering a social security appeal, we have plenary review of all legal issues decided by the Commissioner.  See Poulos

---

dissolves."  Transient ischemic attack, A,D.A.M. encyclopedia, U.S. National Library of Medicine, PubMed Health, http://www.ncbi.nlm.nih.gov/pubmedhealth/PMH0001743/ (Last accessed May 7, 2012) Boyd's TIA occurred on April 24, 2008, and by April 28, 2008, David Neuburger, M.D., his primary care physician, stated that the TIA had "neurologically resolved." Tr. 691.

8. Boyd prior to the stroke had a 30-year history of smoking 2.5 packs of cigarettes per day. Tr. 371.

v. Commissioner of Social Security, 474 F.3d 88, 91 (3d Cir. 2007);
Schaudeck v. Commissioner of Social Sec. Admin., 181 F.3d 429, 431
(3d Cir. 1999); Krysztoforski v. Chater, 55 F.3d 857, 858 (3d Cir.
1995).  However, our review of the Commissioner's findings of fact
pursuant to 42 U.S.C. § 405(g) is to determine whether those findings
are supported by "substantial evidence."  Id.; Brown v. Bowen, 845
F.2d 1211, 1213 (3d Cir. 1988); Mason v. Shalala, 994 F.2d 1058, 1064
(3d Cir. 1993).  Factual findings which are supported by substantial
evidence must be upheld. 42 U.S.C. §405(g); Fargnoli v. Massanari,
247 F.3d 34, 38 (3d Cir. 2001)("Where the ALJ's findings of fact are
supported by substantial evidence, we are bound by those findings,
even if we would have decided the factual inquiry differently.");
Cotter v. Harris, 642 F.2d 700, 704 (3d Cir. 1981)("Findings of fact
by the Secretary must be accepted as conclusive by a reviewing court
if supported by substantial evidence.");  Keefe v. Shalala, 71 F.3d
1060, 1062 (2d Cir. 1995); Mastro v. Apfel, 270 F.3d 171, 176 (4th
Cir. 2001);  Martin v. Sullivan, 894 F.2d 1520, 1529 & 1529 n.11 (11th
Cir. 1990).

    Substantial evidence "does not mean a large or considerable
amount of evidence, but 'rather such relevant evidence as a
reasonable mind might accept as adequate to support a conclusion.'"
Pierce v. Underwood, 487 U.S. 552, 565 (1988)(quoting Consolidated
Edison Co. v. N.L.R.B., 305 U.S. 197, 229 (1938)); Johnson v.
Commissioner of Social Security, 529 F.3d 198, 200 (3d Cir. 2008);

Hartranft v. Apfel, 181 F.3d 358, 360 (3d Cir. 1999).  Substantial evidence has been described as more than a mere scintilla of evidence but less than a preponderance.  Brown, 845 F.2d at 1213.  In an adequately developed factual record substantial evidence may be "something less than the weight of the evidence, and the possibility of drawing two inconsistent conclusions from the evidence does not prevent an administrative agency's finding from being supported by substantial evidence." Consolo v. Federal Maritime Commission, 383 U.S. 607, 620 (1966).

Substantial evidence exists only "in relationship to all the other evidence in the record," Cotter, 642 F.2d at 706, and "must take into account whatever in the record fairly detracts from its weight." Universal Camera Corp. v. N.L.R.B., 340 U.S. 474, 488 (1971).  A single piece of evidence is not substantial evidence if the Commissioner ignores countervailing evidence or fails to resolve a conflict created by the evidence.  Mason, 994 F.2d at 1064.  The Commissioner must indicate which evidence was accepted, which evidence was rejected, and the reasons for rejecting certain evidence. Johnson, 529 F.3d at 203; Cotter, 642 F.2d at 706-707. Therefore, a court reviewing the decision of the Commissioner must scrutinize the record as a whole.  Smith v. Califano, 637 F.2d 968, 970 (3d Cir. 1981); Dobrowolsky v. Califano, 606 F.2d 403, 407 (3d Cir. 1979).

**SEQUENTIAL EVALUATION PROCESS**

To receive disability benefits, the plaintiff must demonstrate an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months."  42 U.S.C. § 432(d)(1)(A).  Furthermore,

> [a]n individual shall be determined to be under a disability only if his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy, regardless of whether such work exists in the immediate area in which he lives, or whether a specific job vacancy exists for him, or whether he would be hired if he applied for work.  For purposes of the preceding sentence (with respect to any individual), "work which exists in the national economy" means work which exists in significant numbers either in the region where such individual lives or in several regions of the country.

42 U.S.C. § 423(d)(2)(A).

The Commissioner utilizes a five-step process in evaluating claims for disability insurance benefits.  See 20 C.F.R. §404.1520; Poulos, 474 F.3d at 91-92.  This process requires the Commissioner to consider, in sequence, whether a claimant (1) is engaging in substantial gainful activity,[9] (2) has an impairment

---

9. If the claimant is engaging in substantial gainful activity, the claimant is not disabled and the sequential evaluation proceeds no further.

that is severe or a combination of impairments that is severe,[10] (3) has an impairment or combination of impairments that meets or equals the requirements of a listed impairment,[11] (4) has the residual functional capacity to return to his or her past work and (5) if not, whether he or she can perform other work in the national economy. Id.  As part of step four the administrative law judge must determine the claimant's residual functional capacity. Id.[12]

Residual functional capacity is the individual's maximum

---

10.  The determination of whether a claimant has any severe impairments, at step two of the sequential evaluation process, is a threshold test. 20 C.F.R. § 404.1520(c). If a claimant has no impairment or combination of impairments which significantly limits the claimant's physical or mental abilities to perform basic work activities, the claimant is "not disabled" and the evaluation process ends at step two. Id.  If a claimant has any severe impairments, the evaluation process continues.  20 C.F.R. § 404.1520(d)-(g). Furthermore, all medically determinable impairments, severe and non-severe, are considered in the subsequent steps of the sequential evaluation process.  20 C.F.R. §§ 404.1523 and 404.1545(a)(2).

11. If the claimant has an impairment or combination of impairments that meets or equals a listed impairment, the claimant is disabled. If the claimant does not have an impairment or combination of impairments that meets or equals a listed impairment, the sequential evaluation process proceeds to the next step. 20 C.F.R. § 404.1525 explains that the listing of impairments "describes for each of the major body systems impairments that [are] consider[ed] to be severe enough to prevent an individual from doing any gainful activity, regardless of his or her age, education, or work experience."  Section 404.1525 also explains that if an impairment does not meet or medically equal the criteria of a listing an applicant for benefits may still be found disabled at a later step in the sequential evaluation process.

12. If the claimant has the residual functional capacity to do his or her past relevant work, the claimant is not disabled.

remaining ability to do sustained work activities in an ordinary work setting on a regular and continuing basis.  See Social Security Ruling 96-8p, 61 Fed. Reg. 34475 (July 2, 1996). A regular and continuing basis contemplates full-time employment and is defined as eight hours a day, five days per week or other similar schedule. The residual functional capacity assessment must include a discussion of the individual's abilities.  Id; 20 C.F.R. § 404.1545; Hartranft, 181 F.3d at 359 n.1 ("'Residual functional capacity' is defined as that which an individual is still able to do despite the limitations caused by his or her impairment(s).").

**DISCUSSION**

The administrative law judge at step one of the sequential evaluation process found that Boyd had not engaged in substantial gainful work activity since February 28, 2007, the alleged disability onset date. Tr. 14.

At step two of the sequential evaluation process, the administrative law judge found that Boyd had the following severe impairment: "residual left hemiparisis[.]" (sic)[13] Id.  The administrative law judge concluded based on the testimony of Dr. Alexander, the medical expert, that Boyd's hypertension, diabetes, history of a transient ischemic attack and farsightedness were non-severe impairments because they were associated with very limited

---

13. Hemiparesis is defined as "muscular weakness or partial paralysis affecting one side of the body." Dorland's Illustrated Medical Dictionary, 837 (32nd Ed. 2012).

symptoms. Tr. 14-15.

At step three of the sequential evaluation process the
administrative law judge found that Boyd's impairments did not
individually or in combination meet or equal a listed impairment. Tr.
15.

At step four of the sequential evaluation process the
administrative law judge found that Boyd could not perform his prior
relevant semiskilled to skilled, light to medium work as a retail
store manager and truck driver but that he had the residual
functional capacity to perform a limited range of unskilled, light
and sedentary work. Tr. 15, 18 and 60-63.  The administrative law
judge found that Boyd is limited to lifting 5 pounds occasionally
with his left upper extremity; he requires normal breaks; he needs to
avoid operating arm levers with his left upper extremity and avoid
operating foot and leg pedals; he needs to avoid climbing stairs and
crawling; he can occasionally handle objects 1-3 inches in diameter
with the left upper extremity; he can occasionally finger with his
left upper extremity; he can occasionally be exposed to extreme cold,
heat, humidity and loud noise; he has to avoid exposure to vibration
impacting his left upper and lower extremities; he has to avoid
working around fast moving machinery and toxic materials; and he
requires the ability to use a cane. Tr. 15 and 57-58.  Boyd must also
avoid using buttons and knobs other than merely pushing them. Id.  In
setting this residual functional capacity, the administrative law

12

judge relied on the opinion of Dr. Alexander, who testified at the administrative hearing on May 28, 2009.

Based on the above residual functional capacity and the testimony of a vocational expert the administrative law judge found that Boyd could perform unskilled, light work as a counter clerk and furniture rental consultant and unskilled, sedentary work as a stuffer and ink printer, and that there were a significant number of such jobs in the local and national economies. Tr. 18.

The administrative record in this case is 697 pages in length, primarily consisting of medical and vocational records. Boyd argues that the administrative law judge failed to appropriately consider the opinion of Dr. Neuburger, Boyd's primary care physician; failed to appropriately consider the opinion of Dr. Alexander; failed to consider third-party witness statements; failed to appropriately consider Boyd's credibility; and failed to adequately develop the record.

We have thoroughly reviewed the record in this case and find no merit in Boyd's arguments. The administrative law judge did an adequate job of reviewing Boyd's vocational history and medical records in her decision. Tr. 12-19.  Furthermore, the brief submitted by the Commissioner thoroughly reviews the medical and vocational evidence in this case. Doc. 10, Brief of Defendant.  At this point we will review some of the medical evidence.

Boyd suffered a stroke in March, 2004. However, he

recovered from that stroke to the point that he was only left with some left-sided residuals.  Boyd attended physical therapy from April 28, 2004 through June 18, 2004. Tr. 434.  At the time of Boyd's discharge from physical therapy, Boyd's strength in his left hip flexor was 4/5 and 4+/5[14] in the remainder of his left side and he was able to resume riding horses. Tr. 434.

On June 29, 2004, Boyd had an appointment with Dr. Neuburger. Tr. 567.  At that appointment Boyd reported that he was "doing a fair bit better," had "good strength," was "walk[ing] without a cane," and "recently returned from a horse back riding trip" although he noted that he was "still somewhat weak on the left side." Id.  Under the objective portion of the report of this appointment, Dr. Neuburger stated that Boyd had "+4 strength of the left leg and 4 to 4 ½ of the left arm" and that Boyd was "able to walk fairly well though it is slow and still has Dorsum flexion of the foot." Id.  Dr. Neuburger noted that Boyd was "[s]tatus post [cerebral vascular accident] doing very well with recovery." Id.

On August 23, 2004, Boyd was treated at the York Hospital for a left clavicle fracture sustained when he was thrown from a bucking horse. Tr. 501-502 and 576-577.  X-rays and a CT scan were

---

14. Motor strength during a neurological examination is rated on a scale of 0 to 5 with 5/5 being normal strength. Strength of Individual Muscle Groups, Neuroexam.com, http://www.neuroexam. com/neuroexam/content.php?p=29 (Last accessed May 9, 2012). "4/5 strength is described as "movement possible against some resistance by the examiner (sometimes this category is subdivided further into 4-/5, 4/5, and 4+/5)." Id.

performed which revealed the fracture. Tr. 576.  Boyd was "placed in a sling-and-swathe of the left arm" and discharged from the hospital with instructions to follow-up with Orthopedic and Spine Specialists on August 26, 2004. Id.   Boyd visited Orthopedic and Spine Specialist as scheduled and was examined by Michael J. Mortiz, M.D. Tr. 647-648.  A physical examination revealed that Boyd was very tender over the left clavicle but "[h]e had normal motion of the elbow, wrist and hand with no tenderness at the wrist and he had no . . . weakness in his fingers." Tr. 647. Furthermore, with respect to his gait Boyd exhibited "a little bit of stiffness in the left lower extremity." Id.  Dr. Moritz placed Boyd in a denim sling which provided more support but also "some mobility." Id.  It was noted that Boyd did not need to have the arm immobilized and recommended that Boyd apply ice to the injury. Id.  Boyd was also prescribed the drug Ultracet.[15] Id.  Dr. Moritz advised Boyd that he could go into work everyday. Tr. 648.

Follow-up x-rays performed on or about September 16, 2004, revealed that the clavicle fracture was healing. Tr. 646.  In October, 2004, Boyd reported some soreness "after digging some ditches" or "putting some fence posts in." Tr. 645.

On April 21, 2005, at an appointment with Dr. Neuburger it

---

15. "Ultracet contains a combinatin of tramadol and acetaminophen. Tramadol is a narcotic-like pain reliever. Acetaminophen is a less potent pain reliever that increases the effects of tramadol." Ultracet, Drugs.com, http://www.drugs.com/ ultracet.html (Last accessed May 9, 2012).

was noted that Boyd was "doing fair" but was smoking a pack of cigarettes per day. Tr. 560.  Boyd at that appointment asked Dr. Neuburger if "it would be okay for him to . . . go back driving truck" to which Dr. Neuburger stated in the medical record "I think at this stage [it] would be safe for him." Tr. 560.

Sometime in June or early July, 2005, Boyd assisted with driving 2000 miles to Florida in 48 hours to deliver a boat. Tr. 558-559.  At an appointment with Dr. Neuburger on July 27, 2005, Boyd stated that he had "[n]o further [cerebrovascular accident] symptoms" and that he was "ambulating quite well now." Tr. 558.  A physical examination revealed 4/5 strength in the left leg and 3 to 4/5 strength in the left arm. Id.  It was noted that Boyd was still smoking "at least ½ pack of cigarettes per day" and Boyd was advised to quit smoking. Id.

At an appointment on August 23, 2005, with Dr. Neuburger, Boyd reported that he had been driving without any problems and felt in "good spirits otherwise."  Tr. 557. Boyd presented to Dr. Neuburger a Department of Transportation form to be filled out. Id. Dr. Neuburger's assessment was that Boyd's cerebrovascular accident was quite stable and that it was safe for Boyd to drive. Id.  A neurological examination of Boyd performed by Dr. Neuburger was normal. Id.  Dr. Neuburger completed the DOT form on behalf of Boyd. Id.

Boyd had appointments with Dr. Neuburger on August 30,

16

September 20, October 7, November 9, and  December 13, 2005. Tr.
552-556.  The reports of these appointments reveal that Boyd was
still smoking and his diabetes and blood pressure were not under
adequate control but that Boyd's cerebrovascular accident was stable
or "doing well." Id.  A report of an appointment with Dr. Neuburger
on January 17, 2006, indicates that Boyd was "doing fairly well,"
his diabetes had improved but his blood pressure was "still somewhat
elevated." Tr. 551.

A note of an appointment with Dr. Neuburger dated March
14, 2006, reveals that sometime in February, 2006, Boyd suffered a
head trauma "while working horses." Tr. 550. A physical examination
of Boyd revealed that his head had "full range of motion without any
palpable deformities," some weakness in the left arm, and 5/5
strength in the right arm with good range of motion. Id.  Dr. Boyd's
assessment was as follows: "Probable mild neuropathic changes." Id.
Dr. Neuburger recommended some anti-inflammatories and observation"
and noted that "hopefully this will improve." Id.

At an appointment  on April 3, 2006, it was noted that
Boyd was "doing fairly well" and his diabetes was under better
control. Tr. 549.

Boyd was again injured on a horse in early April 2006 when
a horse he was trying to break-in stumbled. Tr. 547-548.  Boyd
apparently sustained an injury to the left foot but an x-ray
revealed "[n]o acute traumatic injury." Tr. 574.

Boyd had appointments with Dr. Neuburger on April 11, July 10, August 14, September 11 and 28, October 10 and 25 and December 29, 2006. Tr. 539-546.  The reports of these appointment are unrevealing as to Boyd's work-related functional abilities. Id.  The records reveal that Boyd continued to smoke and he was advised to quit; there were times of inadequate control of diabetes and blood pressure. Id.  Dr. Neuburger consistently noted that Boyd was "doing fairly well." Id.

In October, 2006, there was a notation by Dr. Neuburger in the medical records that Boyd was having episodes of dysphoria.[16] Tr. 541. Dr. Neuburger's assessment was as follows: "Lightheadedness, dysphoria, rule out [Transient Ischemic Attack]." Id.  Boyd was prescribed a 24-hour Holter monitor which was conducted on October 16th and 17th, and revealed "no tachycardias," "a basic sinus rhythm," and "no other worrisome dysrrhythmias[.]" Tr. 563.  At an appointment with Dr. Neuburger on October 25, 2006, Boyd reported that he was "doing fairly well" and "had no further episodes at all." Tr. 540.  At that appointment Boyd's high blood pressure was under adequate control. Id.  It was also noted that the Holter monitor revealed no abnormalities. Id.

On December 29, 2006, Boyd told Dr. Neuburger that he was "feeling fairly well." Id.  Boyd was still smoking, his blood

---

16. Dysphoria is defined as "disquiet, restlessness, malaise." Dorland's Illustrated Medical Dictionary, 579 (32nd Ed. 2012). In other words, a feeling of not being well.

pressure was "not under adequate control," his cerebrovascular accident was stable, his diabetes was under control, and he was advised to quit smoking. Id.

On February 1, 2007, Boyd had an appointment with Dr. Neuburger after having taking a trip to Colorado. Tr. 538. According to the notes of that appointment Boyd was "doing fairly well" and his blood pressure was improved and his diabetes was "better." Id.  The report of this appointment is unrevealing as to Boyd's work-related functional abilities.

On April 3, 2007, Dr. Neuburger authored a "To Whom It May Concern" letter consisting of the following three sentences: "Edward Boyd is a patient under my professional care. He has been disabled since having a stroke in March, 2004. Further information will be disclosed, if needed, with patient's permission." Tr. 562.

On May 17, 2007, Boyd was examined by Lorne Querci, D.O., on behalf of the Bureau of Disability Determination. Tr. 608-611. Dr. Querci observed that Boyd was ambulatory with an ataxic gait but did not use a cane, crutch or walker.[17] Tr. 608.  Dr. Querci's physical examination of Boyd revealed that Boyd had normal strength (5/5) in right hand and only slight diminished strength in the left

---

17. Ataxia is defined as "failure of muscular coordination; irregularity of muscular action."  Dorland's Illustrated Medical Dictionary, 170 (32nd  Ed. 2012). An ataxic gait is "an unsteady, uncoordinated walk, employing a wide-base and feet thrown out." Ataxic gait, The Free Dictionary, http://medical-dictionary. thefreedictionary.com/ataxic+gait (Last accessed May 9, 2012).

hand (4/5). Tr. 611. Boyd did have some reduced range of motion with respect to the left upper extremity, including the left hand. Id. Left hand pincher grasp was extremely weak. Id. Boyd's right upper extremity and hand was normal.[18] Id. Reflexes in the bilateral upper extremities were normal. Tr. 611. With respect to the lower extremities Boyd's hip flexor muscle was weak (3/5) on the left but normal on the right (5/5). Dr. Querci goes on to indicate a reduced functional ability with respect to flexion and extension of the left lower extremity, including the left foot, but not the right lower extremity. Id. Dr. Querci also appears to indicate some abnormality in the reflexes of the left lower extremity. Id. Dr. Querci's assessment was that Boyd suffered from left-sided hemiparesis, residual left upper extremity and hand weakness and left lower extremity weakness. Id. Dr. Querci did not provide a statement of Boyd's work-related functional abilities or complete a range of motion chart.

On June 7, 2007, Rachel Brodbeck, a state agency adjudicator completed a physical residual functional capacity assessment of Boyd on behalf of the Bureau of Disability Determination. Tr. 612-618. Generally, such statements from an adjudicator (who is not a medical doctor) should not be considered. However, in this case it appears that Vrajlal H. Popat, M.D., a physician, concurred with the assessment of Ms. Brodbeck. Tr. 119.

---

18. Boyd is right-handed. Tr. 312.

Ms. Brodbeck's assessment was that Boyd had the physical residual functional ability to engage in a limited range of light work and that assessment supports the administrative law judge's residual functional capacity finding.

On April 7, 2008, Boyd had an appointment with Dr. Neuburger. Tr. 658.  Boyd told Dr. Neuburger that he lost his business, was under a lot of stress, and was applying for disability. Id.  He further told Dr. Neuburger that he had significant weakness in his left hand. Id.  Dr. Neuburger's assessment was that Boyd suffered from "[status post cerebrovascular accident]," "poor compliance with medications and regimen," and "continued tobacco abuse a half pack per day." Id.  Dr. Neuburger strongly recommended that Boyd "spend his money on his medications rather than tobacco[.]" Id.

Also, on April 7, 2008, Dr. Neuburger completed a medical source statement of Boyd's functional abilities. Tr. 656-657.  Dr. Neuburger found that Boyd could lift and carry up to 10 pounds occasionally and 5 pounds frequently in an 8-hour workday; that Boyd could sit for 8 hours in an 8 hour workday, but was limited to standing/walking a total of 1 hour, and only 20 minutes at a time. Tr. 656.  Dr. Neuburger stated that Boyd did not need a hand-held assistive device to stand or walk. Id.  Dr. Neuburger stated that Boyd would need three to four unscheduled breaks of 5 minutes duration in an 8-hour workday, but did not believe that Boyd would

be absent or miss most of the work days unexpectedly more than two times per month. Id.   Dr. Neuburger stated that the limitations he assessed had been present continuously since February 28, 2007. Tr. 657. However, the last time Dr. Neuburger saw Plaintiff was on February 1, 2007, almost 14 months prior to the April 7th appointment.  Consequently, Dr. Neuburger's statement that the limitations had been continuously present was based on Boyd's subjective complaints and statement made on April 7th and not on Dr. Neuburger's actual observations and physical examinations.

Boyd was then hospitalized at the York Hospital for three days starting on April 24, 2008, for complaints of left-sided numbness which was diagnosed as a transient ischemic attack. Tr. 659-681.  This condition as noted earlier in this memorandum resolved after only a few days.  The discharge summary from the hospital indicated that Boyd could be "[u]p and about as tolerated," should not engage in any "strenuous exertion," could drive, and should quit smoking. Tr. 690.  Boyd was also advised him to follow-up with Dr. Neuburger in one week. Id.

Boyd saw Dr. Neuburger on April 28, 2008. Tr. 691. The report of that appointment states in part as follows: "Ed has been doing well. He's been compliant with his medicine since discharged from the hospital, though he hasn't gotten the CHANTIX[19] as yet. Has

---

19. Chantix is a smoking cessation medication. Chantix, Drugs.com, http://www.drugs.com/chantix.html (Lasr accessed May 9, 2012).

22

smoked only two or three cigarettes a day over the weekend. He does feel he can get more compliant now. He's currently applying for disability and otherwise thinks he'll need to go get a job. He has had better spirits. States he's been checking his sugars and they haven't gone over 150." Id.  Dr. Neuburger's assessment was that Boyd suffered from a neurologically resolved transient ischemic attack and tobacco abuse. Id.  The record of this appointment does not provide an indication of Boyd's work-related functional abilities.

At an appointment with Dr. Neuburger on June 19, 2008, Boyd stated that he was "doing fairly well," had "no further neurological problems," was "compliant with his medications" and "down to four cigarettes per day." Tr. 692. He further stated that his diabetes was controlled and that he had "been doing some gardening." Id. Dr. Neuburger's assessment was that Boyd's diabetes was controlled and the cerebrovascular accident was stable. Id.  At an appointment on November 21, 2008, with Dr. Neuburger, Boyd reported no new cerebrovascular attack-type symptoms. Tr. 693. The record of these appointments do not provide an indication of Boyd's work-related functional abilities.

Boyd had an appointment on February 27, 2009, at which Boyd reported that he had "been doing fair." Tr. 694. However, it was noted that Boyd was noncompliant with diet and activities and continued to smoke. Id.  Boyd had "no further neurologic changes."

Id.  Dr. Neuburger stressed the "strong need for [Boyd] to become more compliant with his medication regimen" and advised him to return in three months. Id.  The record of this appointment does not provide an indication of Boyd's work-related functional abilities.

On April 17, 2009, Dr. Neuburger completed a one-question interrogatory indicating that Boyd' work limitations had not changed. Tr. 695.

Finally, Dr. Alexander at the administrative hearing held on May 28, 2009, testified based on his review of Boyd's medical records that Boyd had the ability to perform a limited range of light and sedentary work consistent with the administrative law judge's decision. Tr. 37-38 and 41-43.

Dr. Neuburger clearly indicated that Boyd had the ability to sit a total of 8 hours in an 8-hour workday. Consequently, there is no issue regarding Boyd's ability sit for an extended period of time.  Dr. Alexander testified that Boyd could stand a total of 4 hours per day (30 minutes at a time) and walk for 15 minutes every 2 hours. Tr. 37. Boyd argues that based on the testimony of Dr. Alexander, that the administrative law judge erred in not including a sit/stand option in her hypothetical question to the vocational expert and the corresponding residual functional capacity finding. We will assume that a sit/stand option should have been included in the RFC assessment.  That assumption, however, does not help Boyd because as noted Dr. Neuburger found that Boyd could sit for a total

of 8 hours in an 8-hour workday without the need for a sit/stand option and the administrative law judge based on the testimony of the vocational expert identified two sedentary position which Boyd could perform, i.e., the stuffer and ink printer positions. Tr. 18. Also, the administrative law judge's RFC assessment appropriately addressed Boyd's left-sided weakness and the limitations found by the ALJ are supported by Dr. Alexander's testimony.  The administrative law judge's reliance on the opinion of Dr. Alexander was appropriate. See Chandler v. Commissioner of Soc. Sec., 667 F.3d. 356, 362 (3d Cir. 2011)("Having found that the [state agency physician's] report was properly considered by the ALJ, we readily conclude that the ALJ's decision was supported by substantial evidence[.]").

Boyd also argues that the case should be remanded for the administrative law judge to consider the statements of three lay witnesses who were friends of Boyd.  Specifically, Boyd argues that the ALJ did not address a form completed by Terry Lake in April 2007, as well as two statements given in April 2008 (a three-sentence statement from Kevin Snider, a coworker, and a four-sentence statement from Stephen Noll). Tr. 299-306 and 340-341. It is true that the administrative law judge did not mention these lay witness statements in her second decision.  However, under the circumstance of this case we conclude that the failure to do so was harmless error. Weary v. Astrue, Civil No. 10-896, slip op. at 40-41

(M.D.Pa. Dec. 15, 2010)(Muir, J.)(applying harmless error analysis).

The administrative law judge in her first decision rendered in May 2008 fully addressed the form completed by Terry Lake.  That prior decision was only remanded by the Appeals Council because of the ALJ's failure to address appropriately the question of Boyd's visual acuity. Furthermore, although the other two statements were not specifically addressed by the ALJ in either decision, they provide minimal information.

The statement from Kevin Snider is as follows: "I Kevin Snider have been a co-worker & friend of Edward E. Boyd for close to 20 yrs. Ed calls upon me for home lawn & home maint. duties. He is not able to perform these duties due to his physical limitations." Tr. 341.  The fact that Boyd cannot perform home lawn and maintenance tasks does not draw into question the administrative law judge's conclusion that Boyd can engage in the sedentary positions of stuffer and ink printer.

The statement from Stephen Noll is in toto as follows:" I help Ed if he has things to lift or move witch (sic) he can not due (sic) by himself because of his left arm and leg. When Ed goes along fishing he can't bait the hook or cast his fishing line so I due (sic) these things for him. Ed's putting in a garden to help save money and help with providing food on table I will help with working up the garden and planting seeds and so on." Tr. 340.  The fact that Boyd cannot lift certain unspecified items and needs assistance

when fishing to bait the hook and cast the fishing line does not draw into question the ALJ's finding that Boyd can engage in a very limited type of sedentary work.

We are satisfied that the administrative law judge appropriately took into account all of Boyd's physical limitations in the residual functional capacity assessment. The administrative law judge concluded that Boyd could perform work which was of a sedentary nature.  That conclusion is supported by the opinion of Dr. Alexander.

The administrative law judge stated that Boyd's statements concerning the intensity, persistence and limiting effects of his symptoms were not credible to the extent that they were inconsistent with the ability to perform a limited range of unskilled, light and sedentary work. Tr. 16.  The administrative law judge was not required to accept Boyd's claims regarding his physical limitations. See Van Horn v. Schweiker, 717 F.2d 871, 873 (3d Cir. 1983)(providing that credibility determinations as to a claimant's testimony regarding the claimant's limitations are for the administrative law judge to make).  It is well-established that "an [administrative law judge's] findings based on the credibility of the applicant are to be accorded great weight and deference, particularly since [the administrative law judge] is charged with the duty of observing a witness's demeanor . . . ."  Walters v. Commissioner of Social Sec., 127 f.3d 525, 531 (6th Cir. 1997); see also Casias v. Secretary of

Health & Human Servs., 933 F.2d 799, 801 (10th Cir. 1991)("We defer to the ALJ as trier of fact, the individual optimally positioned to observe and assess the witness credibility."). Because the administrative law judge observed Boyd when he testified at the hearings on May 7, 2008, and May 28, 2009, the administrative law judge is the one best suited to assess the credibility of Boyd.[20]

Our review of the administrative record reveals that the decision of the Commissioner is supported by substantial evidence. We will, therefore, pursuant to 42 U.S.C. § 405(g) affirm the decision of the Commissioner.

An appropriate order will be entered.


s/James M. Munley
JAMES M. MUNLEY
United States District Judge


Dated: May   10, 2012

---

20. Boyd has also argued that the ALJ did not address his work history. While the ALJ did not discuss Boyd's work history specifically in the context of her credibility finding, she undoubtedly considered Boyd's work history in making her decision. The ALJ elicited detailed work history information from Boyd and the vocational expert at two hearings. The failure to address specifically Boyd's work history in the second decision was harmless error under the circumstances of this case. Also, we discern no failure on the part of the ALJ to adequately develop the record.